1

2

3

4

5

6                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
                                     AT SEATTLE
7
STEVEN DARBY MCDONALD,                    )
8                                         )
                         Petitioner,      )        Case No. C07-135-JCC-BAT
9                                         )
           v.                             )
10                                        )        REPORT AND
DOUGLAS WADDINGTON,                       )        RECOMMENDATION
11                                        )
                         Respondent.      )
12 _____)

13

14                              **INTRODUCTION**

15         Petitioner Steven Darby McDonald is a state prisoner who is currently confined at the

16 Monroe Correctional Complex in Monroe, Washington.  Proceeding *pro se*, he seeks relief under

17 28 U.S.C. § 2254 from his 1996 convictions of first and second degree arson, and from his

18 sentence of life imprisonment with no possibility of parole as a persistent offender.  Currently

19 before the Court for review is petitioner's amended petition.  Dkt. 12.  Respondent has filed an

20 answer to the amended petition and petitioner filed a traverse to respondent's answer.  Dkts. 24,

21 29.  The Court, having reviewed the amended petition, response, traverse, governing law, and the

22 balance of the record, recommends that the petition be denied and this action dismissed with

23 prejudice.

# BACKGROUND

The Washington State Court of Appeals ("court of appeals") summarized the facts related to petitioner's conviction as follows:

At Steven McDonald's trial for two counts of arson, the State introduced testimony from several witnesses who interacted with McDonald on the night of the fires. The first, cabdriver Dorothy Evans, testified that on the evening of the fires, she drove McDonald to the West Winds Motel in Mount Vernon. She helped him unload his bags and then left. At trial she testified that McDonald had commented about aliens being after him. The motel manager testified that she rented McDonald a room around 9:00 or 9:30 on the evening of the fires. McDonald called her later in the evening to complain that his neighbors in room 119 were fighting. About 3:30 a.m., he rang the night bell because he had locked himself out. Shortly after 5:00 a.m., police and fire responded to a fire on the mat and door of room 119.

Two other cabdrivers, Garold Hackley and Barry Campbell, also testified about driving McDonald in their cabs the evening of the fire. Hackley remembered picking up McDonald at Cascade Pizza about 2:00 a.m. and taking him across the street to his room at the West Winds. He remembered that McDonald was talking to himself in the back seat. Hackley waited while McDonald went inside his room to get money.

Campbell testified that at about 2:15 a.m., he picked up McDonald and drove him to the West Winds Motel. He waited while McDonald went to get his wallet and a white plastic bucket to put gasoline in. McDonald told Campbell that the gasoline was for a friend's car. Campbell then took McDonald to a gas station where he rented a gas can and purchased gasoline. After stopping at a fast food restaurant, Campbell took McDonald back to the motel. While waiting for McDonald, Campbell saw McDonald pour the gasoline from the can into the bucket. Campbell testified that he got a bad feeling, and left. He remembered that it was about 2:45 a.m. when he left.

Hackley picked up McDonald a second time around 5:00 a.m. He remembered that McDonald was carrying a bucket. In the bucket was a liquid that smelled like gasoline. McDonald told him that the gas was for a friend who needed it to get to the gas station. Hackley drove McDonald back to his motel room. He testified that the bucket recovered from McDonald's room matched the bucket McDonald carried that night.

Edith Clarke had been staying in room 119 with her husband Douglas and son Joseph. She testified that she first had contact with McDonald around 9:30 that night when he complained about noise coming from her room. At around 5:00 a.m., she woke after hearing McDonald talking to himself about starting a

fire. While waking her husband, she heard a plop and saw flames through her window. She immediately went to the door and saw McDonald standing on the other side of the fire smoking a cigarette with a white bucket beside him. She called to her husband to get water to put out the fire. She testified that it took more than two buckets of water to extinguish the flames. When the fire department arrived, they discovered that her son Joseph's van was also set on fire.

When Sergeant Peter Lindberg of the Mount Vernon Police Department arrived, Edith told him that McDonald had started the fire. Lindberg contacted McDonald in his room, and smelled an odor of petroleum on him. The officer heard running water in the bathroom and asked McDonald why the water was running. McDonald told him he was getting ready to take a shower. Lindberg asked to check the bathroom, and found the faucet on full with water pouring into a square plastic bucket directly under the faucet. McDonald emptied the bucket into the tub and explained that he had been cleaning car parts. Lindberg then arrested McDonald.

Dkt. 23, ex. 3, at 2-4; *State v. McDonald* (*McDonald III*), 121 Wash. App. 1048, 2004 WL 1147204 (May 24, 2004).

A jury convicted petitioner of first and second degree arson at a 1996 trial. Dkt. 23, ex. 4, at 1. Petitioner appealed, and the court of appeals reversed the convictions, ruling that the trial court erred when it failed to conduct a sufficient inquiry into a potential conflict of interest between petitioner, who was representing himself, and Gary Gaer, his standby counsel. *State v. McDonald* (*McDonald I*), 96 Wash. App. 311, 318, 979 P.2d 857 (1999). The Washington State Supreme Court ("state supreme court") affirmed, holding that the failure to make such an inquiry is reversible error, and prejudice is presumed. *State v. McDonald* (*McDonald II*), 143 Wash. 2d 506, 513-14, 22 P.3d 791 (2001).

On retrial, petitioner again proceeded *pro se* and a jury again convicted him of first and second degree arson. Dkt. 23, ex. 1, at 1. At sentencing, the trial court found that petitioner had two prior robbery convictions, both serious offenses under the Persistent Offender Accountability Act, triggering a "three strikes" life sentence. *Id.*, ex. 3, at 4. Accordingly, the trial court sentenced petitioner to life in prison without the possibility of parole. *Id*.

Petitioner appealed, through counsel and *pro se*. *Id*. at 1. The court of appeals affirmed his convictions and sentence in an unpublished opinion. *Id*. Petitioner sought discretionary review in the state supreme court, which denied review without comment. *Id*., ex. 8.

Petitioner subsequently filed a personal restraint petitioner ("PRP") in the court of appeals. *Id*., ex. 15, at 1. That court dismissed the petition. *Id*. at 4. Petitioner sought discretionary review in the state supreme court. *Id*., ex. 4, at 1. A commissioner of that court denied review, and the court denied petitioner's motion to modify the commissioner's ruling. *Id*. at 5; *id*., ex. 18.

Petitioner now seeks relief in this petition for writ of habeas corpus under 28 U.S.C. § 2254.

**GROUNDS FOR REVIEW**

Petitioner raises the following five grounds in his federal habeas petition:

1. "The trial court offered unqualified counsel to the petitioner forcing him to proceed pro se in violation of his Sixth Amendment right to the appointment of counsel." Dkt. 12 at 2.

2. "Petitioner's Fifth and Fourteenth Amendment rights to due process of law [were] violated by the state's use of admittedly ruined and unrefutable evidence." *Id*. at 10.

3. "Petitioner's Sixth Amendment right under the confrontation clause was violated when the trial court restricted cross examination that prohibited him from eliciting exculpatory facts and presenting a defense." *Id*. at 21.

4. "The petitioner's constitutional right to direct appeal was vitiated when vital exculpatory testimony was removed from the trial transcript violating his due process rights under the Fifth and Fourteenth Amendments." *Id*. at 30.

5.      "There was insufficient evidence to support the conviction in violation of the due

process clause of the Fifth and Fourteenth Amendment[s] to the United States

Constitution." *Id.* at 39.

## DISCUSSION

### I.      Exhaustion

Respondent concedes that petitioner presented his claims to the state supreme court and

has therefore exhausted his available state remedies as 28 U.S.C. § 2254(b)(1) requires.  Dkt. 24 at

6.

### II.      Evidentiary Hearing

Petitioner requests an evidentiary hearing on each ground.  Dkt 12 at 42.  Respondent

maintains that an evidentiary hearing is not necessary because petitioner's claims raise issues of

law only and may be resolved on the basis of the state court record.  Dkt. 24 at 7.  In his traverse,

petitioner argues that the state court's decision is based on unreasonable determinations of fact and

that he attempted to develop the factual basis of his claims in state court, but was denied the

opportunity.  Dkt. 29 at 2-3.

Under 28 U.S.C. § 2254(e)(1), state court findings of fact are presumptively correct in

federal habeas proceedings, and the petitioner bears the burden of rebutting the presumption of

correctness by clear and convincing evidence.  If the petitioner failed to develop the factual basis

of a claim in state court, the federal court may not hold an evidentiary hearing on that claim

unless:

(A) the claim relies on—
        (i) a new rule of constitutional law, made retroactive to cases on collateral
        review by the Supreme Court, that was previously unavailable; or
        (ii) a factual predicate that could not have been previously discovered
        through the exercise of due diligence; and
(B) the facts underlying the claim would be sufficient to establish by clear and

convincing evidence that but for constitutional error, no reasonable factfinder
would have found the applicant guilty of the underlying offense.

*Id.* § 2254(e)(2).

Failure to develop a claim's factual basis in state court is established only where there is a lack of diligence, or some greater fault, attributable to the petitioner or his counsel. *Williams v. Taylor*, 529 U.S. 420, 437 (2000); *Baja v. Ducharme*, 187 F.3d 1075, 1078-79 (9th Cir. 1999). A habeas petitioner has not failed to develop the factual basis of a claim where he was denied an evidentiary hearing in state court. *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir. 1997).

Here, petitioner sought and did not receive an evidentiary hearing in state court. Dkt. 23, exs. 11, 16, 17. Accordingly, because petitioner did not fail to develop the factual basis of his claims, § 2254(e)(2) does not preclude an evidentiary hearing in this matter.

However, the mere fact that § 2254(e)(2) does not preclude an evidentiary hearing does not entitle petitioner to such a hearing. *Downs v. Hoyt*, 232 F.3d 1031, 1041 (9th Cir. 2000). Instead, the Court retains discretion to determine whether to hold one. *Id.* A petitioner is entitled to an evidentiary hearing if: (1) he alleges facts that, if proven, would entitle him to relief; and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts. *Jones*, 114 F.3d at 1010. An evidentiary hearing is not required on issues that present only questions of law or that the court can resolve by reference to the state court record. *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998); *Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir. 1992). In determining whether an evidentiary hearing is proper, the Court may expand the record and consider affidavits, exhibits, or other materials that cast light on the merits of the petition. *McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir. 1998).

Following an independent review of the record, the Court concludes that an evidentiary hearing is both unnecessary and inappropriate. The issues in this case may be resolved by

reference to the state court record. Petitioner's first, second, third, and fifth grounds raise can be

resolve based on the trial record alone. And with respect to the fourth issue, the record includes

declarations by petitioner and Dr. John DeHaan regarding the testimony by Dr. DeHaan that

petitioner alleges was removed from the transcript on appeal. Dkt. 2 at 409-10, 414. The Court

declines to hold an evidentiary hearing.

**III. Standard of Review**

A federal court may grant a habeas corpus petition with respect to any claim that was

adjudicated on the merits in state court only if the state court's decision was (1) contrary to, or

involved an unreasonable application of, clearly established federal law, as determined by the

United States Supreme Court; or (2) based on an unreasonable determination of the facts in light

of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

A state court ruling is contrary to clearly established federal law if the state court either

arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or

decides a case differently than the Supreme Court "on a set of materially indistinguishable facts."

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court decision is an unreasonable

application of Supreme Court precedent "if the state court identifies the correct governing

principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts

of the prisoner's case." *Id*. at 413. To be an unreasonable application of Supreme Court

precedent, the state court's decision must be "more than incorrect or erroneous." *Cooks v.*

*Newland*, 395 F.3d 1077, 1080 (9th Cir. 2005). Rather, it must be objectively unreasonable.

*Lockyear v. Andrade*, 538 U.S. 63, 69 (2003).

In determining whether a state court decision was based on an unreasonable determination

of the facts in light of the evidence, a federal habeas court must presume that state court factual

findings are correct. 28 U.S.C. § 2254(e)(1). A federal court may not overturn state court findings of fact "absent clear and convincing evidence" that they are "objectively unreasonable." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

When applying these standards, a federal habeas court reviews the "last reasoned decision by a state court." *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

## IV. Right to Counsel

Petitioner asserts that the trial court violated his Sixth Amendment right to counsel when it "attempted to force the appointment of conflict counsel Gary Gaer" and that "the refusal of the court to offer substitute counsel caused the Petitioner to waive his right to the appointment of counsel and represent[] himself in violation of his Sixth Amendment right." Dkt. 12 at 2.

### A. Background

Petitioner represented himself in his first trial, with attorney Gary Gaer as stand-by counsel. *McDonald I*, 96 Wash. App. at 314. But before the trial began, petitioner filed a lawsuit against Mr. Gaer in federal court; the prosecutor's office undertook Mr. Gaer's defense. *Id.* Petitioner, Mr. Gaer, and the prosecutor all requested Mr. Gaer's dismissal as stand-by counsel at various times, but the trial court denied the motions. *Id.* Petitioner's convictions were reversed because of the trial court's failure to inquire into the potential conflict. *McDonald II*, 143 Wash. 2d at 513-14.

On remand, a different attorney, Mr. Chamberlin, was present at petitioner's arraignment on July 26, 2001, and was prepared to file a notice of appearance on petitioner's behalf. Dkt. 23, ex. 21, at 5, 15. However, when petitioner learned that he might be transferred from the Skagit County jail to the Snohomish County jail, which was closer to Mr. Chamberlin's office, he stated that he would discharge Mr. Chamberlin as his counsel and proceed *pro se*. *Id.* at 15.

At the next hearing, on August 10, 2001, Mr. Gaer was present with petitioner. *Id.*, ex. 21A, at 17. Petitioner stated that he had discharged Mr. Chamberlin because he did not want to have to wait while Mr. Chamberlin traveled from out of the county to meet with him. *Id.* at 15. He also stated that he wanted to represent himself for the purpose of presenting several motions to the court, but that he wanted Mr. Gaer to represent him after he had completed his motions and at trial. *Id.* at 6-7. The prosecutor expressed "grave concerns" about whether it was appropriate for Mr. Gaer to represent petitioner. *Id.* at 19. After conducting a colloquy with petitioner regarding the nature of the charges, the possible penalties, and the disadvantages of self-representation, the trial court found that petitioner had knowingly and voluntarily waived his right to counsel. *Id.* at 23-30. Because the trial court allowed petitioner to proceed *pro se*, it made no decision regarding Mr. Gaer's representation at that time. *Id.* at 30.

Mr. Gaer was present at a hearing on August 29, 2001. *Id.*, ex 22, at 110. He told the trial court that he would prefer to prepare for trial differently from the way petitioner was preparing, and that he would want to know soon if he would be appointed. *Id.* at 111. He also stated that he and petitioner had discussed the conflict of interest and petitioner had "indicated his willingness to sign a complete waiver." *Id.*, at 112-13. Mr. Gaer believed that a waiver could resolve any conflict. *Id.* at 113. The prosecutor expressed doubt as to whether a waiver could address the conflict. *Id.* at 114-15. Mr. Gaer stated that there was no other attorney in the county willing to take the case, but he was willing to do so because of his familiarity with the issues and because he and petitioner "seem[ed] to get along pretty well." *Id.* at 116. The trial court again did not make a decision on the issue because petitioner was not requesting Mr. Gaer's representation at that time, but did indicate that it would need to be satisfied that a waiver could address the conflict before it would appoint Mr. Gaer. *Id.* at 117.

At the next hearing, on September 19, 2001, petitioner informed the court that Mr. Gaer had said he could not represent petitioner. *Id.*, ex. 22A, at 33. Mr. Gaer had sent petitioner a letter stating that he believed that, because petitioner had not requested representation after completing his pretrial motions, petitioner was "not willing to let go" of control over the litigation. *Id* at 35-36. Mr. Gaer believed that, in order to adequately represent petitioner at trial, he needed to control pretrial work. *Id.* at 35. Mr. Gaer stated that his decision "may be for the best because if the court did appoint [him] the prosecutors would appeal that decision. Who knows what would happen." *Id.* at 36. The trial court asked petitioner what he wanted to do about an attorney, stating: "[Y]ou are a moving target as far as I'm concerned. One time you want an attorney to represent you, one time you want a stand-by attorney, one time you want Mr. Gaer to represent you. Then you say, well, Mr. Gaer is gone." *Id.* at 37. Petitioner stated he would want counsel for trial. *Id.* at 38. The trial court informed petitioner that it would make a decision on representation at the next hearing. *Id.* at 39.

On October 3, 2001, the trial court told petitioner he could raise the issue of representation at any time.[1] *Id.*, ex. 22B, at 61. Petitioner stated "I'm going to want to do that. I don't want to represent myself. I have never wanted to represent myself. . . . I wanted Mr. Gaer to represent me. . . . I got stuck doing this because nobody would represent me." *Id.* at 61-62. Petitioner explained that he felt he had to do his pretrial motions *pro se* because an attorney would not have done them the way he wanted, but he wanted counsel for trial. *Id.* at 63. The trial court stated it would attempt to find standby counsel for petitioner. *Id.* at 68.

The following day, the trial court told petitioner it had found a lawyer to represent him—

---

[1] A new judge presided over this hearing because the previous judge had recused himself. Dkt. 23, ex. 22B, at 50.

Mr. Gaer. *Id.*, ex. 22C, at 1. Petitioner stated that he wanted a standby attorney. *Id.* at 2. The

trial court told him: "You can have an attorney who represents you, full-blown counsel. Right

now. Or you can continue to represent yourself. Those are the options. And it's up to you." *Id.*

Petitioner chose to continue to represent himself. *Id.* The trial court conducted a second colloquy

with petitioner about self-representation. *Id.* at 3-14. Petitioner stated: "I want to go with what

I'm doing, I think I'm doing right . . . . I've decided to pursue what I'm going through the motions

[sic], and trying to get the exculpatory evidence that's going to show I'm innocent, okay? That's

what I'm doing now." *Id.* at 9. The trial court told petitioner that the trial date was set, that it

would be difficult to find an attorney who would be willing to take on the case two weeks before

trial, and that the court would not move the trial date to accommodate a late request for counsel.

*Id.* at 10-11. The trial court told petitioner "you are seriously jeopardizing your right to obtain

counsel if you choose to do that later in the game." *Id.* at 13. Petitioner reaffirmed his desire to

pursue his own pretrial tactics. *Id.*

At a hearing on October 18, 2001, the trial court asked petitioner if he wanted counsel and

petitioner answered, "No, I already got the brief done." *Id.*, ex. 23, at 61. Later, the following

exchange occurred:

>       THE COURT: . . . Mr. McDonald, at this point I want to be sure again, I'm
>       happy to appoint counsel for you.
>       THE DEFENDANT: I'm fine.
>       THE COURT: You don't want counsel?
>       THE DEFENDANT: No.

*Id.* at 71-72. On October 25, 2001, the trial court asked petitioner if he still wanted to represent

himself, and petitioner stated that he did. *Id.*, ex. 23A, at 42-43. On December 15, 2001, after

petitioner had presented several motions, the trial court asked petitioner, "How are we doing, Mr.

McDonald, with your representing yourself?" Petitioner responded, "I'm doing fine," and

proceeded to bring another motion. *Id.*, ex. 28, at 42. Finally, at the pretrial conference on January 24, 2002, the trial court asked petitioner if he planned to have anyone assist him during trial. Petitioner responded that he did not. *Id.*, ex. 27, at 3-4. Later in the hearing, the following exchange occurred:

> THE DEFENDANT: . . . If I want I can have somebody at my table here?
> THE COURT: If you want.
> THE DEFENDANT: An advisor or something?
> THE COURT: You can have an attorney.
> THE DEFENDANT: That's what I'm talking about.
> THE COURT: We have gone this far without them. I haven't asked you recently. I'm assuming you are still representing yourself?
> THE DEFENDANT: Yeah, I'm still representing myself.

*Id.* at 76. Trial commenced five days later, on January 20, 2002, with petitioner proceeding *pro se*. *Id.* ex. 29.

The last reasoned decision on this issue was by the court of appeals in its opinion denying petitioner's direct appeal. The court found that petitioner's argument that he "got stuck" representing himself was "an inaccurate characterization of the facts and McDonald's actions." *Id.*, ex. 3, at 15. After reviewing petitioner's and the trial court's statements regarding self-representation, the court of appeals found: "At no time was McDonald forced to choose between incompetent or unqualified counsel and self-representation. At every juncture, when asked about continuing to represent himself, he unequivocally chose to proceed pro se. McDonald fails to establish any prejudice." *Id.* at 17.

### B. Analysis

Under the Sixth Amendment, a criminal defendant has the right to be represented by an attorney. U.S. CONST. amend. VI. A criminal defendant may waive the right to counsel, but such a waiver must be "knowing, voluntary, and intelligent." *Iowa v. Tovar*, 541 U.S. 77, 88 (2004); *see also Faretta v. California*, 422 U.S. 806 (1975). A defendant's waiver is knowing and

intelligent if the defendant is made aware of (1) the nature of the charges against him, (2) the possible penalties, and (3) the dangers and disadvantages of self-representation. *United States v. Farhad*, 190 F.3d 1097, 1099 (9th Cir. 1999). A defendant's request for self-representation must be unequivocal, timely, and not for purposes of delay. *United States v. Erskine*, 355 F.3d 1161, 1167 (9th Cir. 2004); *see also Faretta*, 422 U.S. at 835.

Petitioner argues that the court of appeals decision was contrary to, and resulted from an unreasonable determination of the United States Supreme Court's decision in *Wheat v. United States*, 486 U.S. 153 (1988). He argues that that case required the trial court to offer him conflict-free counsel. Dkt. 12 at 7. In *Wheat*, the Court held that the trial court did not err in refusing to permit representation by the defendant's counsel of choice due to a potential conflict of interest. 486 U.S. at 164. It also found that allowing representation by counsel of choice where a conflict or potential conflict exists depends on the facts and circumstances of each case and is within the informed judgment of the trial court. *Id.* Here, when petitioner stated that he would request Mr. Gaer's appointment in the future, the trial court made it clear that it would not appoint Mr. Gaer unless it was satisfied that petitioner had validly waived the conflict. When the trial court later offered to appoint Mr. Gaer as petitioner's counsel, there was no indication that the trial court had changed its position with respect to the waiver. Indeed, given the prosecutor's unwavering opposition to Mr. Gaer's appointment, it is mere speculation to surmise that the trial court would have appointed Mr. Gaer without exploring the conflict and petitioner's ability and willingness to waive it, or that the trial court would have refused to appoint a different attorney should it have found the conflict irreconcilable. The court of appeals decision finding that the trial court did not force petitioner to choose between incompetent or unqualified counsel and self-representation was not contrary to, or an unreasonable application of *Wheat*.

Petitioner also argues that the trial court's attempt to appoint Mr. Gaer was in violation of *Gideon v. Wainwright*, 372 U.S. 335 (1963), and *Entsminger v. Iowa*, 386 U.S. 748 (1967), because there was an irreconcilable conflict between them, and Mr. Gaer's appointment would have thus deprived him of effective assistance of counsel. Dkt. 12 at 8. However, as discussed above, the trial court had made it clear that it would need to be satisfied that the conflict could be waived before appointing Mr. Gaer. The trial court never made such a determination because petitioner refused Mr. Gaer's representation and decided that he wished to direct the course of litigation himself.

Petitioner contends that the trial court's offer of Mr. Gaer as counsel forced him to choose between counsel with whom he had a conflict of interest or self-representation, and that this was not in fact a "choice." *Id.* at 8. However, the Ninth Circuit has found that where a defendant consistently requests to represent himself, even if that request is conditional, the request is unequivocal. *Adams v. Carroll*, 875 F.2d 1441, 1444-45 (9th Cir. 1989). Petitioner points to no Supreme Court case holding otherwise. Before his trial, petitioner consistently stated that he wanted to represent himself for his pretrial motions; he did not equivocate on this request even when the trial court warned him it could affect his ability to obtain counsel for trial. Moreover, in the months leading up to trial, each time the trial court raised the issue of self-representation, petitioner stated that he wished to continue representing himself or that he was doing "fine" representing himself. The court of appeals' conclusion that petitioner unequivocally waived his right to counsel is not contrary to or an unreasonable application of Supreme Court precedent.

Petitioner also argues that the court of appeals decision resulted from an unreasonable determination of the facts. He maintains that the trial court attempted to force Mr. Gaer's appointment on October 4, 2001, and that its refusal to offer substitute counsel forced him to

waive his right to counsel and represent himself. Dkt. 12 at 2. However, at the October 4, 2001 hearing, the trial court was attempting to deal with petitioner's shifting positions on when he would seek counsel. The trial court warned petitioner that a delay in seeking representation could harm his ability to obtain a lawyer for trial, and petitioner decided to maintain his course of action in representing himself.

Petitioner also characterizes the trial court's later inquiries about his self-representation as attempts to force Mr. Gaer's appointment. *Id.* at 8. But the trial court did not mention Mr. Gaer after the October 4, 2001 hearing. The trial court inquired about petitioner's desire to continue representing himself on at least four additional occasions. On none of these occasions did the trial court suggest that Mr. Gaer was petitioner's only choice of counsel or, indeed, mention Mr. Gaer's name. Instead, it inquired if petitioner wished to continue representing himself or how he was doing representing himself. Petitioner answered unequivocally each time that he wished to continue *pro se* or that he was doing "fine" representing himself. While petitioner had stated at several earlier hearings that he would want counsel to represent him for trial, he did not renew this request as the trial date approached, despite the trial court's inquiries. Based on the record as a whole, the state court of appeals reasonably determined that petitioner unequivocally chose to represent himself.

## V.    Failure to Preserve Exculpatory Evidence

Petitioner next argues that the State violated his Fifth and Fourteenth Amendment right to due process of law when the arresting officers "allegedly 'destroyed' and suppressed the existence of irreplaceable material exculpatory evidence . . . leaving him unable to obtain comparable evidence to refute their trial testimony that they had detected gasoline vapors on his person and in his hotel room." *Id.* at 10.

**A.     Background**

Mount Vernon Officer Peter Lindberg testified at trial that he smelled gasoline on petitioner and in the bathroom when he entered petitioner's hotel room to investigate the fire.  Dkt. 23, ex. 29, at 145, 150.  After transporting petitioner to the police station, Officer Lindberg swabbed petitioner's hands and collected the clothing petitioner was wearing.  *Id.* at 163-64.  He placed the swabs in a paper envelope and the clothing in paper bags, which was his usual practice for packaging evidence.  *Id.* at 164-65.  He testified that he "made an error" in using paper packaging and that he has since learned that evidence with petroleum product on it should be packaged in sealed containers.  *Id.* at 173-75.  This was the first time he was the responsible officer in an arson investigation.  *Id.* at 135.  He filed a request for laboratory examination of the evidence on February 12, 1996, eight days after the fire.[2]  *Id.* at 741.

Mount Vernon Detective Tobin Ruxton testified that he smelled gasoline when he was in the interview room with petitioner at the police station.  *Id.*, ex. 31, at 640.  He collected a parka from petitioner's hotel room, which he packaged in a plastic bag.  *Id.*, ex. 32, at 716.  He testified that he believed at the time that he was properly packaging the evidence, but he has since learned that arson evidence should be packaged in sealed containers.  *Id.* at 716-17.  He had been involved with only two arson investigations prior to this case.  *Id.* at 634-35.

Mark Malone, a fire investigator with the Mount Vernon Fire Department, testified that packaging arson evidence in sealed containers seals in any ignitable liquid vapors that may be present on the item.  *Id.*, ex. 31, at 561-62.  He packaged the evidence he collected in sealed containers, but he did not help Officer Lindberg or Detective Ruxton package the evidence they collected.  *Id.* at 535, 554, 561.

---

[2] The fire occurred on February 4, 1996.  Dkt. 23, ex. 29, at 136.

Erik Neilson, a laboratory manager with the Washington State Patrol Crime Laboratory, testified that some of the evidence he received was "not properly packaged to contain or retain volatile material." *Id.*, ex. 31, at 570-72. He did not detect any petroleum products on the hand swabs or the clothing he tested, but he could not form an opinion on about whether there had been petroleum products on the items at a previous time. *Id.* at 584-87, 591-92. He also testified that the lab received the evidence on March 22, 1996, more than six weeks after the fire, and that the likelihood of detecting gasoline on the improperly packaged items would have been higher if the lab had received them earlier. *Id.* at 611-12. He stated, "We like to see people get training in this particular type of examination or evidence collection because we found over the years, while there are a lot of fire investigators who are experienced with this, most police officers are not. So there are mistakes made," and "We have this problem with many police agencies, improperly packaged evidence. It is an ongoing problem." *Id.* at 614.

The state court of appeals, in its order dismissing petitioner's personal restraint petition, concluded:

> Police officers admitted that they failed to properly package this evidence and that, as a result, the gasoline evaporated before testing occurred. But this was, if anything, helpful to McDonald's case because the State could not establish by scientific testing that gasoline was present. McDonald fails to show how he was prejudiced by the inability to test the evidence for gasoline.

*Id.*, ex. 15, at 2-3. The state supreme court commissioner, in his ruling denying review, ruled:

> It is undisputed that the officer failed to package the items in a way that would have preserved any gasoline residue. But since this evidence was at best potentially useful to the defense, Mr. McDonald must demonstrate bad faith on the part of police in order to establish a due process violation. *State v. Copeland*, 130 Wn.2d 244, 280, 922 P.2d 1304 (1996). Mr. McDonald does not show that the officers acted in bad faith.

*Id.*, ex. 4, at 3-4.

**B.     Analysis**

A due process violation occurs whenever the State suppresses or fails to disclose material exculpatory evidence, regardless of the good or bad faith of the prosecution. *United States v. Agurs*, 427 U.S. 97, 110-11 (1976); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). But failure to preserve "potentially useful evidence" does not constitute a denial of due process unless a criminal defendant can show bad faith on the part of police. *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988). Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 681-82 (1985). Evidence is merely potentially useful evidence when "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57.

The state supreme court, in the last reasoned decision on this issue, concluded that the evidence was "at best potentially useful to the defense."[3] Dkt. 23, ex. 4, at 3-4. Petitioner argues that, had Officer Lindberg and Detective Ruxton properly packaged the clothing evidence, it "could have exonerated the Petitioner since . . . other exculpatory evidence existed tending to prove his innocence." Dkt. 12 at 19. However, the most that can be said is that properly packaged clothing could have been subjected to tests, and the results of these tests could have been favorable to petitioner. In fact, unlike the situation in *Youngblood*, where testing of DNA recovered from the victim could have exonerated the defendant, 488 U.S. at 55, a negative test result here would not have precluded petitioner from being the perpetrator of the arson. Such a result would have

---

[3] Although the state supreme court cited to a Washington state case only, that case applied the United States Supreme Court rule. *See Copeland*, 130 Wash. 2d at 279-80 ("*Youngblood* provides the proper constitutional standard for preservation of potentially exculpatory evidence.").

merely cast doubt on the officers' testimony that they smelled gasoline on petitioner. The state court's conclusion that the evidence was at best potentially useful evidence was not contrary to or an unreasonable application of United States Supreme Court precedent, nor was it an unreasonable determination of the facts.

Because the evidence was potentially useful evidence, the improper packaging of the evidence was a due process violation only if petitioner can show that the officers acted in bad faith. *Youngblood*, 488 U.S. at 57-58. The state supreme court concluded that petitioner did not meet this burden. Dkt. 23, ex. 4, at 3-4. Petitioner argues that, even if the evidence was only potentially useful evidence, the officers acted in bad faith when they improperly packaged it. Dkt. 12 at 19; dkt. 29 at 12. He lists 16 "egregious" acts of bad faith, and 6 more "collateral" acts of bad faith. Dkt. 29 at 8-10. These acts include the failure of the Mount Vernon Police Department to establish arson evidence collection protocols and properly train its officers, the fact that the officers collected the evidence themselves and did not ask for assistance from the fire investigator, the fact that the officers saw the fire investigator collect other evidence in sealed containers but did not do so themselves, and the delay in sending the evidence to the laboratory for testing. *Id.* But Officer Lindberg and Detective Ruxton both testified that they were following the procedures they normally use to package evidence, that they thought they were correctly packaging the evidence, and that it was only later that they learned of their mistake. Fire investigator Malone testified that police officers often do not know the proper procedure for collecting evidence containing volatile materials. Petitioner's claims of bad faith are speculative at best. The state supreme court's conclusion that petitioner did not show bad faith was not contrary to or an unreasonable application of United States Supreme Court precedent, nor was it an unreasonable determination of the facts.

**VI.    Right to Confrontation**

Petitioner argues that the trial court violated his Sixth Amendment right to confront the witnesses against him when it restricted his examination of Kevin Steward, the defense investigator, and his cross-examination of Officer Lindberg, Detective Ruxton, and Barry Campbell. Dkt. 12 at 21. He asserts that "[t]he Court's limiting orders curtailed the defense of mistaken identification and that he had told both arresting officers that Tommy lit the fire." *Id.*

**A.    Background**

Prior to Officer Lindberg's testimony, the State moved to exclude any references to a written statement that Richard Thurau, a gas station attendant who was deceased at the time of trial, gave to Officer Lindberg several days after the fire. Dkt. 23, ex. 29, at 116. When petitioner asked Lindberg about the statement, the State objected. *Id.* at 201-02. The trial court, ruling that the statement was "clearly hearsay" and there was no basis to find an exception to the hearsay rule, excluded the statement. *Id.* at 204-05.

Prior to petitioner's cross-examination of Detective Ruxton, the State expressed concern that petitioner would attempt to elicit hearsay testimony about what various witnesses had told the detective. *Id.*, ex. 32, at 673-74. Petitioner stated that he wished to question Detective Ruxton about statements Lester McFarland and Richard Thuran made to Detective Ruxton, including their initial descriptions of the person who bought gasoline from them on the night of the fire and their inability to identify either petitioner or Barry Campbell, the cab driver who drove petitioner to the gas station where they worked, in a photomontage. *Id.* at 680, 686-87, 696. The trial court repeatedly explained that petitioner could not ask Ruxton what someone else told him for purposes of the truth of the matter asserted, even if it was in Ruxton's police report. *Id.* at 676-77, 679, 682-84, 686.

The trial court also cautioned petitioner that he could not ask the police officers about statements petitioner claimed he had made about someone named "Tommy" lighting the fire. *Id.*, ex. 29, at 205. The court stated:

> If you know the witness is going to say, no, I have never heard of Tommie [sic]; no, you didn't say anything to me about Tommie; no, I didn't investigate anybody named Tommie, then it is improper for you to bring that name up in questions.
> Now, on the other hand, if you had said something to Officer Lindberg about a Tommie, or if Tommie was featured in his investigation in some way, that question would be proper. But as it is, without knowing full well that Officer Lindberg knows nothing about a Tommie and was never told about a Tommie, it is improper for you to bring him up at this point in time.
> After your testimony [if] you talk about Tommie, then Tommie is fair game.

*Id.* at 205-06.

Petitioner sought to present evidence of cab driver Barry Campbell's drug use and arrest history. *Id.*, ex. 26, at 10-15. The trial court ruled that Mr. Campbell's two third degree theft convictions were admissible as crimes of dishonesty, but the circumstances underlying those convictions were not. *Id.* at 34. The trial court also ruled that, if Mr. Campbell were to admit on direct examination having used drugs on the day of the fire, petitioner could not present additional testimony about Mr. Campbell's drug use at or around the time of the fire. *Id.* at 35. However, if Mr. Campbell were to deny using drugs that day, the trial court would permit petitioner to propose specific impeachment testimony. *Id.* The trial court also ruled that it would permit petitioner to explore Mr. Campbell's drug use on the day he testified at petitioner's first trial or the current trial. *Id.* at 38.

Petitioner also sought to present evidence that Mr. Campbell received a benefit in a criminal case in exchange for his testimony in petitioner's case. *Id.* at 10-15. The evidence showed that the prosecutor had reduced Mr. Campbell's second degree theft and theft of a firearm

charges to two counts of third degree theft, but this occurred before Mr. Campbell testified in petitioner's first trial. *Id.* at 32. The evidence also showed that the prosecutor had exonerated Mr. Campbell's bail and returned it to the bonding company, but that, based on the circumstances, the prosecutor was required to do so regardless of how Mr. Campbell testified. *Id.* at 32-33. The trial court found that these facts did not rise to the level of circumstantial evidence that Mr. Campbell received a benefit for his testimony. *Id.* at 32. Petitioner sought reconsideration on this ruling, arguing that the evidence showed Mr. Campbell was working with a drug task force in a neighboring town, but the trial court denied the motion and prohibited any reference to Mr. Campbell as a state agent. *Id.*, ex. 27, at 13, 22-25.

Petitioner sought to introduce testimony by Kevin Steward, the defense investigator, about the interviews Mr. Steward conducted with various witnesses. *Id.*, ex. 33, at 866-67. The trial court told petitioner:

> To the extent that you asked about statements made to Mr. Steward and you believe Mr. Steward will say something different than what the witness said, then you are entitled to impeach the witness in that fashion. What you cannot do is get Mr. Steward up here to recount everything that everybody else told him.
>
> . . .
>
> This is what is not going to happen, you are not going to get up and start reading to Mr. Steward the statements made by other individuals unless you can tell me and you are sure you can tell me that you already asked the witness about that statement and it was inconsistent.

*Id.* at 868-69. Petitioner agreed to ask Mr. Steward only questions about statements inconsistent with the witnesses' testimony. *Id.* at 869-70. Mr. Steward testified that Edith Clarke told him that she did not see petitioner start the fire but she thought he had because she heard him outside her hotel room. *Id.* at 918. Ms. Clarke also told him she thought she heard two voices coming from petitioner's hotel room on the night of the fire. *Id.* at 919. Mr. Steward also testified that Patricia

1  Stevens, the hotel manager, told him that Ms. Clarke asked her how many people were staying in

2  petitioner's room.  *Id.* at 923.  Ms. Stevens also told him that the door only needed to be sanded

3  and repainted and that she did not plan to submit a restitution statement for the damage.  *Id.* at

4  923-24.

5      The court of appeals, in denying petitioner's direct appeal, ruled as follows on the issue of

6  examining these witnesses:

7          McDonald raises a number of closely related challenges to the trial court's
    handling of his requests to investigate State witnesses. . . .

8          Trial courts have broad discretion when choosing to admit or deny
    evidence.  Appellate courts will not overturn such decisions absent an abuse of

9   discretion.  A trial court abuses its discretion only if its decision is manifestly
    unreasonable or is based on untenable grounds.

10          . . .

          McDonald also argues that the trial court improperly limited his
11  questioning of Campbell.  Throughout his pretrial motions, McDonald attempted
    to establish that Campbell was providing doctored testimony in exchange for

12  leniency from the State.  The court prohibited McDonald from pursuing this line
    of questioning by pointing to the absence of support for his claims.

13          The trial court did allow McDonald to impeach Campbell about his prior
    convictions and his drug use on the night of the fires.  The State chose to address

14  these in its direct examination.  Campbell admitted using heroin on the night of
    the fire, and talked about his prior criminal convictions.  On cross-examination,

15  McDonald questioned him extensively about his continuing drug use, and the
    description of McDonald he gave to the police.

16          McDonald attempts to characterize Campbell as the State's "informant
    witness."  But McDonald provided no evidence linking Campbell's testimony in

17  this case with any leniency or special favors by the State.  The trial court correctly
    rejected his claims.

18          . . .

          The court gave McDonald great latitude to establish his theory that the
19  arresting officers conspired to frame him.  McDonald attempted to impeach
    Officer Ruxton about whether the statements obtained during his interview were

20  correct.  McDonald also questioned Ruxton about his motive for charging him as
    a persistent offender . . . In fact, McDonald pursued an aggressive line of

21  questions, attempting to impeach the officer about numerous aspects of the
    investigation.  The record simply does not support McDonald's assertion that the

22  trial court improperly limited his right to confront Ruxton.

23  *Id.*, ex. 3, at 4-7 (internal footnotes omitted).

REPORT AND RECOMMENDATION – 23

In its order dismissing petitioner's personal restraint petition, the court of appeals found:

"McDonald next alleges that his rights to cross-examine and impeach witnesses, to investigate,

and to introduce evidence of witness bias were violated at trial. But McDonald raised these issues

on direct appeal, and this court rejected them." *Id.*, ex. 15, at 2. The state supreme court

commissioner's ruling denying review stated:

> Mr. McDonald next argues that the trial court erroneously constrained his cross-examination of witness Barry Campbell and two police officers. But the Court of Appeals rejected this argument on direct appeal. Mr. McDonald does not show that the interests of justice require reconsideration of this issue. *See In re Pers. Restraint of Lord*, 123 Wn.2d 296, 303, 868 P.2d 835 (1994).
>
> Mr. McDonald also contends that the trial court improperly limited the testimony of a defense investigator to rebuttal. But he does explain [sic] precisely what error the court committed not does he demonstrate prejudice. *Lord*, 123 Wn.2d at 303 (petitioner must show actual and substantial prejudice from constitutional error or complete miscarriage of justice from nonconstitutional error).

*Id.*, ex. 4, at 3.

### B.    Analysis[4]

A criminal defendant has a constitutional right to present a defense. *Chambers v.*

*Mississippi*, 410 U.S. 284, 301 (1973). However, a defendant "does not have an unfettered right

to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules

of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). Rather, "the accused, as is required of

the State, must comply with established rules of procedure and evidence designed to assure both

---

[4] Petitioner argues that this court's review of this issue should be *de novo* because the state courts have not reached the merits of these arguments. Dkt. 12 at 28. He asserts that his appellate counsel raised only the issue of a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), not the right to confrontation. *Id.* However, on direct appeal, the court of appeals addressed the issue as encompassing the trial court's decision to limit cross-examination and to exclude impeachment evidence. Dkt. 23, ex. 3, at 4-7. Both the court of appeals and the state supreme court later concluded that the court of appeals had addressed these issues. Dkt. 23, ex. 4, at 3; *id.*, ex. 15, at 2. And the state supreme court explicitly rejected petitioner's claims related to Mr. Steward's testimony. *Id.*, ex. 4, at 3. The record does not support petitioner's claim that the state courts have not addressed these issues.

fairness and reliability in the ascertainment of guilt and innocence." *Chambers*, 410 U.S. at 302.

For example, hearsay rules "prohibit the introduction of testimony which, though unquestionably

relevant, is deemed insufficiently reliable." *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996). What

the Constitution prohibits is the exclusion of critical, trustworthy defense evidence, particularly

where the evidence is central to the defendant's case and directly refutes the State's allegations.

*See, e.g., Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986). To obtain habeas relief, "the state

court's decision to exclude certain evidence must be so prejudicial as to jeopardize the defendant's

[federal] due process rights." *Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir. 1990).

Additionally, the Sixth Amendment's Confrontation Clause secures the right of cross-

examination. *Douglas v. Alabama*, 380 U.S. 415, 418 (1965). But, as with the right to present a

defense, this right is not absolute. Rather, "trial judges retain wide latitude insofar as the

Confrontation Clause is concerned to impose reasonable limits on such cross-examination based

on concerns about, among other things, harassment, prejudice, confusion of the issues, the

witness' safety, or interrogation that is repetitive or marginally relevant." *Delaware v. Van*

*Arsdall*, 475 U.S. 673, 679 (1986). The Constitution guarantees an opportunity for effective cross-

examination, not cross-examination in whatever way, and to whatever extent the defendant

wishes. *Id.* A defendant has stated a Confrontation Clause claim "by showing that he was

prohibited from engaging in otherwise appropriate cross-examination designed to show a

prototypical form of bias on the part of the witness," thereby allowing the jury to evaluate the

witness's reliability. *Id.* at 680.

Petitioner maintains that the trial court prevented him from engaging in appropriate cross-

examination designed to allow the jury to evaluate the reliability of the State's witnesses. Dkt. 12

at 28-29. But a review of the cross-examination petitioner sought to conduct shows otherwise.

Petitioner sought to cross-examine Officer Lindberg and Detective Ruxton about hearsay statements made to them by witnesses who were unavailable to testify. Petitioner directly states that the trial court's restriction on these statements "prohibited the jury from learning the truth about the witnesses' original description of the perpetrator . . . ." *Id.* at 29. Petitioner admits that he was seeking to present these hearsay statements to the jury as substantive evidence of his innocence—not to cast doubt on the officers' credibility.

Petitioner also faults the trial court for prohibiting him from questioning the officers about statements petitioner claims he made to them about "Tommy" starting the fire. *Id.* The trial court ruled that petitioner could not ask questions about these statements if he knew in advance that the officers would deny that petitioner had made them. Given the anticipated responses to these questions, any further questions would have been inappropriate, and allowing petitioner to ask the questions would have served only to confuse the jury. Moreover, as with the questions about the unavailable witnesses' statements, these questions sought to present substantive evidence to the jury. The proper method for petitioner to present this information to the jury was, as the trial court made clear, not through questions to people who maintained that petitioner never made the statements, but through petitioner's own testimony.[5] The trial court afforded petitioner great latitude to cross-examine Officer Lindberg and Detective Ruxton, including questioning them about their motives in pursuing the arson charges against him and the conspiracy petitioner alleged existed between them.

Petitioner claims that the trial court's limitations on his questioning of Mr. Campbell kept the jury from learning "the true extent of [Mr. Campbell's] undercover cooperation with various police agencies." *Id.* However, Mr. Campbell's cooperation with law enforcement in unrelated

---

[5] Petitioner testified extensively about his version of the statements he made to Officer Lindberg and Detective Ruxton. Dkt. 23, ex. 33, at 944-50, 956-57, 964-66.

matters was collateral to his testimony in petitioner's case. This was not an instance where the trial court excluded evidence that directly refuted the State's allegations. Rather, the trial court evaluated the circumstantial evidence of Mr. Campbell's alleged cooperation with the police, and concluded that it did not rise to the level of showing that Mr. Campbell in fact received a benefit for his testimony. Given the trial court's wide latitude in excluding evidence of little or no relevance, it was well within its discretion to exclude this evidence. Mr. Campbell's prior convictions of crimes of dishonesty and his drug use at the time of the fire were brought forth by the State on direct examination and further explored by petitioner on cross-examination. Dkt. 23, ex. 31, at 476-79, 498-500.

For all of the foregoing reasons, the court of appeals' denial of petitioner's claims relating to cross-examination of Officer Lindberg, Detective Ruxton, and Mr. Campbell was not contrary to or an unreasonable application of clearly established federal law, nor did it entail an unreasonable determination of the facts.

Petitioner also challenges the limitations on his direct examination of Mr. Steward. He maintains that the trial court's restrictions prevented the jury from hearing that Ms. Clarke told Mr. Steward and Ms. Stevens that she heard another voice in petitioner's hotel room and that she told Mr. Steward that she only assumed petitioner lit the fire. Dkt. 12 at 29. But Mr. Steward did in fact testify about these statements. Dkt. 23, ex. 33, at 918-19, 923-24. Once again, petitioner seems primarily concerned with his ability to present hearsay statements—here, statements to his investigator—for the truth of the matter asserted therein. But petitioner, like the State, was required to follow standard rules of evidence and procedure. *Chambers*, 410 U.S. at 302. The trial court's ruling limiting petitioner's ability to present hearsay testimony did not infringe on petitioner's right to present a defense. The state supreme court's denial of this claim was not

contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

**VII.    Right to Appeal**

Petitioner next argues that his right to appeal was violated when exculpatory testimony was removed from the trial transcript.[6] Dkt. 12 at 30.  He asserts that he was not able to properly challenge the sufficiency of the evidence because his defense expert's testimony was not included in the record on appeal.  *Id.*

**A.    Background**

Petitioner retained Dr. John DeHaan as an expert in investigation and reconstruction of fires and explosions.  Dkt. 23, ex. 34, at 988.  Dr. DeHaan reviewed the police and fire reports, the crime lab report, transcripts from the first trial, and photographs from the scene of the fires.  *Id.* at 994-95.  When asked about the doormat, he stated that it "appeared to be as I said the focus of the fire, the pattern on the door, and door step indicated that the mat was there at this time . . . ."  *Id.* at 1023.  He testified that there were "no laboratory findings that indicate contact between Mr. McDonald and the fire at the door."  *Id.* 1030.  He also referred to "the damage as recorded in the photographs that I have seen to the door, the adjacent wall is consistent with an ignitable liquid basically at floor level and burning for a short length of time."  *Id.* at 1036.  The record contains no direct statements by Dr. DeHaan that the door was never on fire and was not damaged.

Petitioner told his appellate counsel about his claim that the transcript omitted portions of Dr. DeHaan's testimony.  Dkt. 2 at 410.  Counsel, however, would not raise the claim because it involved matters outside the record and was therefore not appropriate for a direct appeal.  *Id.*

_____

[6] Petitioner does not specify in his habeas petition who he believes is responsible for the alleged omission, although he alleged in his personal restraint petition that it was done at the direction of the prosecuting attorneys.  Dkt. 23, ex. 11, at 6.

Petitioner obtained an affidavit from Dr. DeHaan which stated:

> Since the extent of damage to this door was a critical element of the case, I
> expected extensive questioning regarding the nature of the damage. As I now
> review the [trial transcript], I can find only one question . . . dealing with damage
> to the door (and that question only dealt with the possibility of it being caused by
> a fire on the doormat outside the door). I can find no mention of questions that I
> recall being asked during the proceedings.

*Id.* at 414. Petitioner states that the trial court and the Skagit County Clerk have refused his

requests to send color copies of the photograph exhibits to Dr. DeHaan so Dr. DeHaan could

reconstruct his trial testimony. Dkt. 12 at 32-33.

The state court of appeals, in its order dismissing petitioner's personal restraint petition,

ruled:

> In this petition, McDonald first contends that the State removed testimony by
> defense expert witness Dr. John DeHaan from the record, depriving him of the
> ability to appeal on the basis of the sufficiency of the evidence. This testimony
> allegedly said that the hotel room door was never on fire and was not damaged.
> But a review of the record shows that in his testimony, Dr. DeHaan referred to the
> pattern of the fire on the door and the damage to the door as recorded in
> photographs. This negates McDonald's claim that Dr. DeHaan testified that the
> door was never on fire or damaged. McDonald does not present any evidence
> showing what Dr. DeHaan's missing testimony would have included or how he
> was prejudiced by the lack of this testimony in the record on appeal, given the
> substantial evidence of guilt.

Dkt. 23, ex. 15, at 2.

The state supreme court commissioner's ruling denying review stated:

> But Mr. McDonald fails to show that the record excludes any such
> testimony. Dr. DeHaan spoke on direct examination of the "pattern" of fire
> damage to the door, and on cross-examination he verified that the "damage" to the
> door as revealed by the photograph he examined was consistent with a fire being
> started on the mat next to the door. Nothing in the transcript of Dr. DeHaan's
> testimony suggests there is any other testimony missing from the record. Nor
> does Dr. DeHaan's affidavit verify Mr. McDonald's claim of missing testimony
> about damage to the door. Dr. DeHaan avers that he "expected extensive
> questioning regarding the nature of the damage" and that he could "find no
> mention [in the transcript] of the questions that I recall being asked during the
> proceedings." But he does not describe what questions he "recalls" being asked

nor does he assert that he testified that the door sustained no burn damage.

> And even if Mr. DeHaan so testified, Mr. McDonald demonstrates no prejudice. In considering the sufficiency of the evidence, the reviewing court views the evidence in the light most favorable to the State. *State v. Green*, 94 Wn.2d 216, 221, 616 p.2d 628 (1980). That view of the evidence supports Mr. McDonald's first degree arson conviction on all of the means charged. That Dr. DeHaan may have testified favorably to Mr. McDonald's position does not alter that result.

*Id.*, ex. 4, at 2-3 (footnote omitted).

### B.    Analysis

Although there is no federal constitutional right to an appeal, once a state grants that right, the procedures it uses must comport with the Due Process and Equal Protection clauses of the Constitution. *Evitts v. Lucey*, 469 U.S. 387, 393 (1985). Where a trial transcript is necessary for adequate appellate review, due process requires the state to provide one for indigent defendants. *Griffin v. Illinois*, 351 U.S. 12, 18-19 (1956). However, due process does not necessarily require a full verbatim trial transcript, but only requires a transcript of sufficient completeness to permit proper consideration of the claims. *Bundy v. Wilson*, 815 F.2d 125, 135 (1st Cir. 1987). Due process is not offended if a defendant is provided the portions of the trial transcript that pertain to the particular issues on appeal. *Draper v. Washington*, 372 U.S. 487, 495-96 (1963).

Petitioner faults the state courts' finding that he had not shown that Dr. DeHaan's testimony was incomplete. Dkt. 12 at 35. He contends that the state courts incorrectly focused on Dr. DeHaan's remaining trial testimony, and not Dr. DeHaan's affidavit stating that he could find no mention of the questions he recalled being asked. *Id.* at 35-36. The state supreme court did in fact consider Dr. DeHaan's affidavit, but found it unpersuasive given the fact that Dr. DeHaan did not describe the questions he recalled being asked or aver that he testified that the door did not burn and was not damaged. Dkt. 23, ex. 4, at 2-3. Petitioner claims that Dr. DeHaan was unable to "reconstruct" his testimony without copies of the trial exhibits. Dkt. 12 at 35. But petitioner's

burden was to show that portions of Dr. DeHaan's original testimony were missing, not to have Dr. DeHaan provide new or different testimony. Given the ambiguity of Dr. DeHaan's affidavit and the absence of any obvious break or disruption in his testimony, the state supreme court's finding that petitioner had not shown an omission in the transcript of Dr. DeHaan's testimony was not an unreasonable determination of fact.

Petitioner also contends that the state court's decision was contrary to federal law because the missing testimony prevented proper consideration of his insufficiency of the evidence claim. *Id.* at 36-37. He argues that he was denied due process because of his inability "to use Dr. DeHaan's complete exculpatory trial testimony and his references to various trial exhibits to structure [his] sufficiency of the evidence arguments on direct appeal, no matter what the alleged outcome could, would, or may have been." *Id.* at 38. However, when evaluating a claim of insufficiency of the evidence, a reviewing court must view the evidence in the light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). It must also presume that the trier of fact resolved any conflicts in the evidence in favor of the prosecution and must defer to that resolution. *Id.* at 326. Even if the record had included testimony by Dr. DeHaan stating that the door was not in fire, it also included testimony by the State's fire investigator that the door did burn. The Court presumes that the jury would have resolved this conflict in favor of the prosecution. Petitioner does not explain how additional testimony from Dr. DeHaan would have allowed him to construct a sufficiency argument that would have permitted the state courts to ignore the prosecution evidence that the door was on fire. Accordingly, petitioner has not shown how any missing testimony prejudiced him in his appeal. The transcripts were sufficiently complete to permit the state courts to review petitioner's sufficiency claim, and the state supreme court's decision on this issue was not contrary to or an unreasonable application of United States

1  Supreme Court precedent.

2  **VIII.   Sufficiency of the Evidence**

3      Finally, petitioner challenges the sufficiency of the evidence against him, arguing that the

4  evidence was insufficient to support a conviction on each of the alternative means of first degree

5  arson, or on all of the elements of either charge.  Dkt. 12 at 39.

6      **A.      Background**

7      The State charged petitioner with one count of first degree arson, by three alternative

8  means, and one count of second degree arson.  Under Washington law, a person is guilty of first

9  degree arson if:

10      he or she knowingly and maliciously:
        (a)  Causes a fire or explosion which is manifestly dangerous to any human like,
11      including firefighter; or
        (b)  Causes a fire or explosion which damages a dwelling; or
12      (c)  Causes a fire or explosion in any building in which there shall be at the time a
        human being who is not a participant in the crime . . . .

13
14  RCW 9A.48.020.[7]  A person is guilty of second degree arson if "he knowingly and maliciously

15  causes a fire or explosion which damages . . . any automobile, or other motor vehicle . . . ."  RCW

    9A.48.030(1).

16
17      On appeal, petitioner, through counsel, argued that there was insufficient evidence to

18  support the third alternative means of committing first degree arson because there was no evidence

19  that the fire entered the room when Edith Clarke opened the door.  Dkt. 23, ex. 3, at 7-8.  The state

    court of appeals ruled:

20
21      Fire investigator Malone testified that there was damage to the motel room
        door, explaining that "there was damage to the veneer surface on the door, some
22      surface burning.  It had become a smoldering type fire.  The material was actually

    _____

23  [7]  The State did not charge petitioner with the fourth alternative means, causing "a fire or
    explosion on property valued at ten thousand dollars or more with intent to collect insurance
    proceeds."  RCW 9A.48.020(1)(d).

beginning to burn." McDonald notes that while cross-examining Malone, he asked about his report and stated that, "There is no listing here [on the report] that [the victim] had told you that the door had actually been on fire, is that correct?" Malone agreed.

But McDonald wrongly focused on his own evidence, and not the evidence the State presented. Direct testimony by victim Edith established that the door was on fire when she opened the door. The motel manager testified that the damage to the door required scraping and repainting. She explained that the damage went into the wood of the door. Substantial evidence supports the jury's conclusion that when Edith opened the door, the flames entered the building.

*Id.* at 9. The court of appeals also ruled on petitioner's *pro se* challenge to the sufficiency of the evidence supporting all elements of the crimes: "Because the facts as established by Edith and the cabdrivers are sufficient to support McDonald's conviction, we reject this argument." *Id.* at 17.

### B. Analysis

As discussed above, when evaluating a claim of insufficiency of the evidence, a reviewing court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The Supreme Court has emphasized that constitutional sufficiency review is sharply limited and that the reviewing court owes great deference to the trier of fact. *Id.* Under the standard established in Jackson,

a federal habeas court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution.

*Id.* at 326. The jury is entitled to believe the prosecution's evidence and disbelieve the defense's evidence. *Wright v. West*, 505 U.S. 277, 296 (1992).

Citing to Washington law, petitioner argues that the jury was required to return a unanimous verdict on each alternative. Dkt. 12 at 41. But the federal Constitution does not require the jury to unanimously decide the means by which a defendant committed a crime when

alternate means are charged. *Schad v. Arizona*, 501 U.S. 642, 631-32 (1991) (plurality opinion). So long as there was sufficient evidence to support each of the alternative means, jury unanimity on a particular means was not required.

Petitioner faults the state court of appeals for not explicitly finding that the evidence supported each of the three alternate means of committing first degree arson or every element of the charged crimes. Dkt. 12 at 43. While the court addressed in detail only the argument related to the third alternative means, raised by counsel, it later addressed, and rejected, petitioner's *pro se* challenge to the sufficiency of the evidence as a whole. This was not error.

Petitioner argues that the motel room door was never on fire. *Id.* at 40. But Ms. Clarke testified that when she opened the hotel room door, the door, threshold, and mat were on fire, and it took more than two buckets of water to put the fire out. Dkt. 23, ex. 29, at 65-67. The hotel manager also testified that the door required scraping and sanding after the fire because "the fire went into the wood." *Id.*, ex. 30, at 362. This was sufficient evidence for the jury to conclude that the fire was in a building in which a non-participating person was at the time.

Petitioner also challenges the sufficiency of the evidence with respect to all the elements of the crimes. He points to the fact that he called 911 after the fire on the door started, pulled the burning mat away from the motel room door, and allowed firefighters to enter his room to check for collateral fires. Dkt. 12 at 39-40. But, again, petitioner incorrectly focuses on his own evidence. At trial, the prosecution presented evidence that petitioner took several trips between his hotel room and a gas station through the course of the night in order to obtain gasoline. Edith Clarke heard petitioner talking to himself about starting a fire before she discovered the fire at the door. Gasoline was used to set both the fire at the door and on the Clarkes' van. The fire at the door was set at the threshold to the hotel room's only exit. This was sufficient evidence for the

jury to conclude that petitioner committed first and second degree arson. The state court's decision so finding was not contrary to or an unreasonable application of clearly established federal law.

## CONCLUSION

For the reasons set forth above, the Court recommends that petitioner's § 2254 habeas petition (Dkt. 12) be DENIED and this action DISMISSED with prejudice. A proposed order accompanies this Report and Recommendation.

DATED this 6th day of November, 2008.

_____
BRIAN A. TSUCHIDA
United States Magistrate Judge